417 F.2d 597
 UNITED STATES of America ex rel. Heyward SPEAKS
v.
Joseph R. BRIERLEY, Superintendent, State Correctional Institution, Philadelphia, Pennsylvania 19130, Appellant.
 No. 17676.
 United States Court of Appeals Third Circuit.
 Argued September 18, 1969.
 Decided October 29, 1969.
 
 Joseph J. Musto, Asst. Dist. Atty., Philadelphia, Pa., James D. Crawford, Asst. Dist. Atty., Chief, Appeals Division, Richard A. Sprague, First Asst. Dist. Atty., Arlen Specter, Dist. Atty., Philadelphia, Pa., for appellant.
 E. Barclay Cale, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee.
 Before BIGGS, KALODNER and FREEDMAN, Circuit Judges.
 OPINION OF THE COURT
 FREEDMAN, Circuit Judge.
 
 
 1
 The issue in this habeas corpus case arises from a difference between the district court and the Pennsylvania courts in the construction of the language of a criminal sentence and the method of determining it.
 
 
 2
 The issue requires a statement of the facts.
 
 I.
 
 3
 Petitioner was found guilty on November 25, 1958, in a Philadelphia criminal court on 50 bills of indictment,[1] charging, variously, rape, assault and battery with intent to ravish, aggravated assault and battery, burglary, sodomy, mayhem, carrying a concealed deadly weapon and unlawful impersonation of an officer. All of the latter charges apparently were related to the sexual crimes. On April 3, 1959 he was sentenced under Pennsylvania's "Barr-Walker Act"[2] to imprisonment for an indeterminate term from one day to life on Bill No. 938 which charged aggravated assault and battery and assault and battery with intent to ravish. On the remaining 49 bills there was endorsed after the printed word "Sentence" the following notation which was signed by the judge: "See sentence on Bill #938. Oct. 1955. No costs. By the Court."
 
 
 4
 More than three years later, on November 21, 1962, petitioner's application for habeas corpus was granted in the Philadelphia Court of Common Pleas on the ground that the sentence had violated the Barr-Walker Act because it was imposed more than 90 days after conviction.[3] He was ordered returned to the sentencing judge for further proceedings.
 
 
 5
 On May 17, 1963, the sentencing judge, considering that the habeas corpus judge had in effect vacated the Barr-Walker sentence on Bill No. 938, sentenced petitioner on two of the other 49 bills (Nos. 940 and 970) to consecutive terms of imprisonment for not less than five nor more than 15 years.
 
 
 6
 Two and one-half years later, petitioner again was awarded habeas corpus in the Court of Common Pleas on the ground that the sentences on Bills Nos. 940 and 970 had originally been suspended and that under the doctrine of Commonwealth v. Duff, 414 Pa. 471, 200 A.2d 773 (1964),[4] a new sentence could not be imposed after the expiration of the term of court. On appeal by the Commonwealth, a majority of the Superior Court held that Duff was inapplicable because sentence had never been suspended on Bills Nos. 940 and 970 and that the original sentences thereunder and on all the remaining indictments had incorporated the Barr-Walker sentence written out on Bill No. 938. The Superior Court therefore reversed the order and affirmed the judgments of sentence entered on Bills Nos. 940 and 970. Commonwealth ex rel. Speaks v. Rundle, 209 Pa.Super. 227, 224 A.2d 805 (1966). The Supreme Court of Pennsylvania refused an allocatur.[5]
 
 
 7
 Claiming that he had exhausted his state remedies, petitioner filed the present petition for federal habeas corpus. The district court decided that the language "See sentence on Bill #938 * * *" was ambiguous and that the state courts had denied petitioner the due process required by the Fourteenth Amendment in construing that language on its face without affording him an opportunity to present extrinsic evidence regarding the sentencing judge's intention. The district court, therefore, held an evidentiary hearing, at which a clerk in the office of the Clerk of the Court of Quarter Sessions appeared. He testified that he had filled in the language on the indictments which the sentencing judge had signed and that this language customarily was used when a suspended sentence was intended. There was also introduced in evidence the district attorney's list of cases for May 17, 1963, which bore a handwritten notation that sentence had originally been suspended on Bills Nos. 940 and 970. In addition, there was introduced the sentencing judge's comment at the time of the resentencing when petitioner's counsel inquired whether sentence on the remaining 47 bills was suspended, and the judge replied: "Yes. They are suspended as of the last time." At that time the court agreed with counsel's statement that the habeas judge had vacated the sentence imposed under the Barr-Walker Act on Bill No. 938, and then added: "Lest he vacated the suspended sentence on the other bills, we can mark them all suspended." Finally, petitioner himself testified on his understanding of the sentence, in support of his claim.
 
 
 8
 The Commonwealth offered no evidence, contending that the construction of the language of the sentences was entirely a matter of state law on which the appellate state courts had already spoken definitively in petitioner's case. The district court, however, concluded that petitioner's evidence made it "overwhelming that the trial judge intended to, and did, suspend sentence" on Bills Nos. 940 and 970 as well as on all the other 47 bills, and that the state courts had denied petitioner the equal protection of the laws guaranteed by the Fourteenth Amendment in failing to apply to him the doctrine of Duff. It therefore granted the petition for habeas corpus, United States ex rel. Speaks v. Brierley, 293 F. Supp. 528 (E.D. Pa. 1968), and the Commonwealth has appealed.
 
 II.
 
 9
 Even if due process required that petitioner be given an opportunity to offer evidence outside the record of the sentencing judge's intention, a proper regard for comity would require that the federal courts should not be the first to hold such an evidentiary hearing. Otherwise, the anomalous result follows that the judgment of a state court is interpreted by a federal court on the basis of the testimony of the state court's clerk regarding the state court's custom and practice, although the state court itself has never heard the testimony of its clerk and has had no opportunity to consider its weight or value.
 
 
 10
 This case is unlike United States ex rel. Gockley v. Myers, 411 F.2d 216 (3 Cir. 1969), in which we held that where a federal court has already decided that there was no waiver of a claim that a confession was involuntary, it is appropriate in exceptional circumstances for it also to decide the voluntariness of the confession. In Gockley the federal court was required to hold an evidentiary hearing in order to decide the threshold federal question of waiver. Here, however, the only federal questions are matters of state law, and the evidentiary hearing dealt with the custom and practice of the state court, a matter which peculiarly calls for initial decision by the state courts.
 
 
 11
 We pointed out in Gockley that the principle of exhaustion of state remedies embodied in 28 U.S.C. § 2254 is founded on considerations of comity and is not a jurisdictional requirement. The principle must be applied in a practical manner in the light of the circumstances of the individual case. See Fay v. Noia, 372 U.S. 391, 420-421, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). See also Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166 (1935). Here practical considerations of comity weigh heavily against the exercise of federal jurisdiction before the state court has had an opportunity to consider the issue.
 
 
 12
 The petitioner therefore should at least have been required to seek an evidentiary hearing in the state court and to have exhausted his state remedies on the factual issue raised, before a federal court would act upon it.
 
 
 13
 There is, however, a deeper problem than the self-restraint involved in comity, and to this we now turn.
 
 III.
 
 14
 Regardless of any question of comity, the petition for habeas corpus should have been dismissed because the Pennsylvania courts did not deny petitioner either due process or equal protection in undertaking a full judicial consideration and determination of the meaning of the sentences. Far from denying any constitutional rights of petitioner, the Superior Court applied the established rule in Pennsylvania that a sentence, like any other judgment, is to be construed so as to give effect to the intention of the sentencing judge and that to determine this intention the court will limit itself to the language of the judgment despite oral statements of the sentencing judge which are not incorporated in it. Under this doctrine, where it is necessary because of ambiguity or insufficiency to look beyond the language of the judgment itself, the range of inquiry is limited to the record. At the very most, if the language of the judgment as entered is inaccurate, the remedy is by correction in a direct proceeding in the sentencing court. The general principle was expressed with his usual felicity by Mr. Justice Cardozo in Hill v. United States ex rel. Wampler, 298 U.S. 460, 56 S.Ct. 760, 80 L.Ed. 1283 (1936):
 
 
 15
 "Two of the questions certified to us * * * make mention of a variance between the commitment and the sentence `orally pronounced.' If that were the only variance, we should deem it unimportant. The only sentence known to the law is the sentence or judgment entered upon the records of the court. [Citing cases.] If the entry is inaccurate, there is a remedy by motion to correct it to the end that it may speak the truth. People ex rel. Trainor v. Baker, 89 N.Y. 460, 466. But the judgment imports verity when collaterally assailed. Ibid. Until corrected in a direct proceeding, it says what it was meant to say, and this by an irrebutable presumption. In any collateral inquiry, a court will close its ears to a suggestion that the sentence entered in the minutes is something other than the authentic expression of the sentence of the judge." (p. 464, 56 S.Ct. p. 762)
 
 
 16
 After pointing out that the real issue in the case was not a variance between the sentence as recorded and as orally pronounced but rather between the sentence and the commitment, Mr. Justice Cardozo continued:
 
 
 17
 "The argument is made that there is a practice in the Maryland District to make the commitment broader than the judgment, and that the practice should be given the quality of law. There is no such overriding virtue in usage or tradition. The court speaks through its judgment, and not through any other medium. It is not within the power of a judge by instructions to a clerk to make some other medium the authentic organ of his will. * * * Something more is needed than a few words of unrecorded talk between a judge and a prothonotary * * *." (pp. 465-466, 56 S.Ct. p. 763)
 
 
 18
 Wampler is but an oft-quoted statement of a general principle. It was quoted with approval in the leading Pennsylvania case of Commonwealth ex rel. Scoleri v. Burke, 171 Pa.Super. 285, 90 A.2d 847 (1952). There the Superior Court rejected the argument that separate consecutive sentences of imprisonment from 10 to 20 years on two separate bills were overcome by the sentencing judge's oral pronouncement, appearing in the transcript, that he was sentencing the relator to imprisonment from 20 to 40 years. Relator claimed on habeas corpus that the judge had imposed a single "lumped" sentence for the two offenses which was illegal because it exceeded the allowable maximum punishment on either indictment. The Superior Court, quoting from Wampler, rejected the argument on the ground that the sentences recorded on the bills of indictment constituted the sentences imposed and that the oral statements made by the judge which were not incorporated in his signed judgment were not part of the judgment of sentence.[6] The general doctrine is expressed in many other Pennsylvania cases,[7] and is itself based on the law prevailing in other jurisdictions.[8] In Speaks the Superior Court applied the principle of Scoleri, saying:
 
 
 19
 "A sentence, as any other judgment, is construed in its entirety according to the usual canons of construction, and so as to give effect to the intent of the sentencing court: Commonwealth ex rel. Scoleri v. Burke, 171 Pa.Super. 285, 90 A.2d 847. With this well established principle in mind, we examine the words `See sentence on Bill No. 938', placed by the trial judge on each of the other forty-nine bills of indictment immediately following the printed word `Sentence.' Given their ordinary meaning, these words import that the trial judge intended to have the sentence written on Bill No. 938 apply to all the bills There is not one word in the record at that time to indicate that the court suspended sentence on the other forty-nine bills of indictment. The effect of his language was to incorporate by reference the sentence which had been imposed on Bill No. 938." (209 Pa.Super. at 231, 224 A.2d at 807.)
 
 
 20
 The state courts are best able to determine the meaning of their own judgments. The construction of the judgments in this case is, of course, not free from doubt, as evidenced by the division in the Superior Court and the Superior Court's reversal of the Court of Common Pleas. But certainly the Superior Court's conclusion that the sentence was not ambiguous is a reasoned one which falls within the general contours of the applicable legal principle long established in Pennsylvania. Its application to the facts in petitioner's case did not deny him either due process or the equal protection of the laws.
 
 
 21
 Moreover, the Superior Court did not rely exclusively on its reading that the language of the sentences alone indicated an intention to apply the same sentence to all 50 bills. It looked to the record at the sentencing and found corroboration for its view in the fact that "not one word in the record" indicated that the judge intended to suspend sentence on the other 49 bills and from the further fact that it would be a contradiction of the legislative policy to impose sentence under the Barr-Walker Act and at the same time place the defendant on probation on the other indictments by suspending sentence. The dissenting judge would have held that the sentences on all the bills except No. 938 were suspended and argued that the language used by the sentencing judge was what was customary to express that purpose. This view, however, was rejected by the majority and by the two concurring and dissenting judges who believed that only a general Barr-Walker sentence was rendered on all the indictments and only one sentence therefore could be entered on the resentencing. The Superior Court therefore gave full effect to the more expanded view that not only the language of the recorded sentence itself but also all other indications of intention present in the record at the time of sentencing may be looked to as aids in the determination of the intent and meaning of the sentence.
 
 
 22
 It is true that the Superior Court did not make use of outside evidence such as that which was offered at the hearing before the district judge. But the doctrine which excludes in a collateral attack the use of extrinsic evidence to ascertain the meaning and interpretation of a judgment does not violate due process. It expresses an understandable and reasonable caution against opening the door to fraud and even corruption by permitting the easy impeachment of a judgment by oral evidence. The all pervading tension in the law created by the contradictory desires for stability and for individualized justice makes the pendulum of the law oscillate between according finality and even sanctity to the record of judgments and even of private agreements and affording recognition to the individual purpose which may lie behind the words employed. Wigmore has traced the history of the effort to maintain the integrity of writings against subsequent oral inquiry into their meaning, an effort which at common law extended not only to judicial records but also to private documents of legal significance. See 9 Wigmore, Evidence §§ 2450, 2458-63, 2470-73 (3d ed. 1940). Various policy considerations cluster at each of the extreme borders of the two views and the choice which individual states may make in the extent to which they will enforce the integrity of their written judgments or contracts and the degree to which they will permit them to be attacked or exposed to inquiry is a matter of state law beyond condemnation as contrary to due process.
 
 
 23
 It is within the power of Pennsylvania's courts, which have strongly enforced the parole evidence rule against oral variation of written contracts,[9] to seek to maintain the integrity of a recorded judgment of sentence and keep it free from alteration or impeachment by subsequent oral testimony as to the meaning intended by the scrivener. History records illustrations enough of the evils which might ensue if judgments of sentence could be tampered with by subsequent oral evidence of their intention contrary to the meaning of the words used.[10] Pennsylvania, as we have indicated, permits recourse to the record where the recorded judgment is ambiguous. It held in Speaks, in a regular judicial proceeding, that the judgment was not ambiguous and that even if it were, there was nothing in the record indicating an intention other than that which it read from the sentence itself.
 
 
 24
 It follows that petitioner was not denied due process because the state court took no oral evidence in a collateral habeas corpus proceeding. Nor did the state court discriminate against petitioner or deny him the equal protection of the laws because it applied a well-settled Pennsylvania doctrine with judicial fairness to the circumstances of his case.
 
 
 25
 The judgment of the district court will be reversed with direction to dismiss the petition for habeas corpus.
 
 
 
 Notes:
 
 
 [1]
 One additional indictment charging rape and assault was dismissed because of the running of the statute of limitations
 
 
 [2]
 Act of January 8, 1952, P.L. (1951), 1851, 19 Purdon's Pa.Stat.Annot. § 1166 et seq
 We held in United States ex rel. Gerchman v. Maroney, 355 F.2d 302 (3 Cir. 1966), approved in Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed. 2d 326 (1967), that the findings made by the sentencing judge which authorized the drastic punishment made mandatory by the Act were in violation of due process because they denied the defendant the right of confrontation and cross-examination. The Pennsylvania courts thereafter, on the basis of Specht, held that the Barr-Walker Act itself was unconstitutional. Commonwealth v. Dooley, 209 Pa.Super. 519, 232 A.2d 45 (1967), allocatur refused, 210 Pa.Super. xxxviii.
 
 
 [3]
 Section 3 of the Barr-Walker Act, 19 Purdon's Pa.Stat.Annot. § 1168, authorizes the court to postpone sentence and to order the defendant to temporary confinement while awaiting a psychiatric examination and report of the Department of Welfare, but such temporary confinement may not exceed 90 days and if the examination and report are not given to the court within that period, no Barr-Walker sentence may be imposed. In the petitioner's case, the order for temporary confinement was entered on November 25, 1958, and the psychiatric report was given to the court on March 2, 1959, a delay of 97 days. Sentence was not imposed until 32 days later, on April 3, 1959
 
 
 [4]
 Reversing 201 Pa.Super. 387, 192 A. 2d 258 (1963)
 
 
 [5]
 210 Pa.Super. xxxvii
 
 
 [6]
 The Superior Court pointed out that the oral statement merely voiced the cumulative effect of the separate sentences
 
 
 [7]
 Commonwealth ex rel. Spencer v. Ashe, 364 Pa. 442, 71 A.2d 799 (1950); Commonwealth v. Hosendorf, 214 Pa.Super. 525, 257 A.2d 281 (1969); Commonwealth v. Zelnick, 202 Pa.Super. 129, 195 A.2d 171 (1963), cert. denied 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054; Commonwealth ex rel. Middleton v. Banmiller, 195 Pa.Super. 45, 169 A. 2d 343 (1961); Commonwealth ex rel. Darby v. Myers, 190 Pa.Super. 461, 154 A.2d 297 (1959); Commonwealth ex rel. Senkovich v. Banmiller, 184 Pa.Super. 592, 135 A.2d 788 (1957); Commonwealth ex rel. Marelia v. Hill, 177 Pa. Super. 520, 110 A.2d 832 (1955); Commonwealth ex rel. Chambers v. Claudy, 171 Pa.Super. 115, 90 A.2d 383 (1952). See also United States ex rel. Darrah v. Brierley, 290 F.Supp. 960 (E.D.Pa. 1968), discussing Pennsylvania law
 
 
 [8]
 See the compilation of cases in 24 C.J.S. Criminal Law, § 1585. Also see, e. g., Hill v. United States ex rel. Wampler, 298 U.S. 460, 56 S.Ct. 760, 80 L.Ed. 1283 (1936); Accardi v. Blackwell, 412 F.2d 911 (5 Cir. 1969)
 
 
 [9]
 Gianni v. R. Russell & Co., Inc., 281 Pa. 320, 126 A. 791 (1924), is the leading case in Pennsylvania. For a collection of the cases in Pennsylvania see 2 Henry, Pa.Evidence § 591 et seq. (1953). For the general doctrine and the cases elsewhere see 3 Corbin Contracts § 573 ff. (1960); see also Uniform Commercial Code, § 2-202
 
 
 [10]
 See, e. g., 3 Blackstone, Commentaries *408-410